**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**ALFRED J. HILL, JR.,**

    **Plaintiff,**

          **:**

  **v.**            **Case No. 2:21-cv-4141**
                 **Judge Sarah D. Morrison**
                 **Magistrate Judge Kimberly A.**
**OHIO DEPARTMENT OF**       **Jolson**
**MENTAL HEALTH AND**
**ADDICTION SERVICES,**     **:**

    **Defendant.**

## <u>OPINION AND ORDER</u>

This matter is before the Court on Ohio Department of Mental Health and Addiction Services's ("MHAS") Motion for Summary Judgment. (ECF No. 25.) MHAS argues there are no genuine issues of material fact on any of the claims brought by Alfred J. Hill, Jr. for discrimination, retaliation, and enforcement of an arbitration award. (*Id.*) Mr. Hill opposes the Motion (Opp., ECF No. 55),[1] and MHAS replied. (Reply, ECF No. 60.) This Motion is ripe for consideration.

For the reasons below, MHAS's Motion is **GRANTED.**

---

[1] Mr. Hill seeks to supplement his opposition (ECF No. 54) with a copy of his May 2022 Notice of Right to Sue and to make editorial changes. The Motion to Amend *Instanter* is **GRANTED**. (ECF No. 55.)

## I.    RELEVANT FACTS

MHAS is a state agency charged with the care and treatment of persons with mental illness and addiction disorders. (Opp., ECF No. 55-1, PAGEID # 2388.) It provides pharmaceutical products to eligible mental health and addiction service providers across the state; MHAS's Ohio Pharmacy Services ("OPS"), which includes the Central Pharmacy Inpatient division ("CPI"), distributes the pharmaceuticals. At CPI, pharmacists and pharmacist technicians sort, organize, and ship medications. (*Id.*) MHAS receives federal funding.

Mr. Hill, who is disabled and African American, began his employment with MHAS as a CPI staff pharmacist in April 2014. (Hill Dep. 30:6-11, ECF No. 47, PAGEID # 818.) As a full-time employee, Mr. Hill was a member of the Service Employees International Union ("SEIU") Local 1199 and subject to a collective bargaining agreement. (*See id.*, 36:6-20, PAGEID # 824-25.) As a staff pharmacist, Mr. Hill was responsible for preparing, labeling, and packing medication; validating new and refilled prescriptions; monitoring for safe practices; performing final checks of prescriptions; and supervising pharmacy technicians. (Ives Dec. ¶ 26, Ex. 3, ECF No. 49-2, PAGEID #1571,1581.)

### A.    The Prescription Order Workflow

CPI receives prescription orders and processes over 4,000 prescriptions daily. (Cudzil Dec. ¶ 7, ECF No. 49-3, PAGEID # 1584.) The prescription orders are often time-sensitive and require detailed processing. (*See id.*) To ensure timely and safe distribution of prescription orders, CPI maintains a workflow process as follows:

(1)    a prescription is faxed to CPI,

(2)     a pharmacy technician enters the prescription details into the computer,

(3)     a pharmacist "validates" the order,

(4)     a pharmacy technician fills the prescription,

(5)     a pharmacist performs a final check to ensure that the medication has been dispensed correctly, and

(6)     a pharmacy technician scans the medication into a tote for delivery.

(Cudzil Dec. ¶ 8; ECF No. 49-3, PAGEID # 1584; *see also* Opp., ECF No. 55-1, PAGEID # 2390.) On any given shift, there would be multiple technicians and pharmacists working each step. (*See, e.g.*, Cudzil Dep. 46:2-24, 47:25-48:3, ECF No. 48, PAGEID # 1337, 1338-39.) Depending on CPI's production and volume, Mr. Hill would be assigned to either validating pharmacist or final check pharmacist. (*See* Hill Dep. 44:10-13, ECF No. 47, PAGEID # 832.)

A validating pharmacist receives the prescription orders and creates prescription labels, then verifies the patient's name and medical history, dosage, directions, and appropriateness. (Cudzil Dec. ¶ 9, ECF No. 49-3, PAGEID # 1585; *see also* Hill Dep. 44:1-11, ECF No. 47, PAGEID # 832.)

After validation, a technician fills the prescription and prepares it for final check by either retrieving dispensed cards from the computerized orders or by manually scanning the barcode. (Cudzil Dec. ¶ 10, ECF No. 49-3, PAGEID # 1585.) After the technician fills the prescription and places it on trays, the validating pharmacist sends it to final check. (*Id.*; *see* Hill Dep. 84:22-85:4, ECF No. 47, PAGEID # 872-873.)

The final check pharmacist selects a tray that was either manually filled or filled by computerized orders. (Cudzil Dec. ¶ 12, ECF No. 49-3, PAGEID # 1586.) He

then scans the prescription label, which populates the prescription data and image into the computer, and verifies the medication, quantity, number of blister cards, and expiration date. (*Id.*) If he finds an incorrect number of pills, he must fix it; any other error is set aside to be fixed later by a technician. (*Id.*) Finally, the pharmacist scans the product bar code and repeats the process for each medication on the tray. (*Id.*) Completed trays are placed on a designated cart for shipping to the specific institution. (*Id.*)

Manual orders are more time-consuming than computerized orders in final check. (Opp. ECF No. 55-1, PAGEID # 2392.) For the first few years that Mr. Hill worked at MHAS, all final check pharmacists were required to meet productivity standard of 150 checks per hour with a daily average of 600 checks for manual fills or 750 for computerized fills. (Cudzil Dec. ¶ 14, ECF No. 49-3, PAGEID # 1587; Spolarich Dec., Ex. 4, ECF No. 49-4, PAGEID # 2012.)

### B. Mr. Hill's Accommodation Requests

Mr. Hill suffers from narcolepsy, sleep apnea, work related musculoskeletal injuries, diabetic neuropathy, and diabetes. (Hill Dep. 31:2-20, ECF No. 47, PAGEID # 866.) He made several requests for accommodation over the years due to his disabilities, including adjustments to his work schedule. (*Id.*) He complains that MHAS denied three of his requests: 1) recuperative time request, 2) flex time modification request, and 3) testing area request. (Opp., ECF No. 55-1, PAGEID # 2389.)

4

MHAS's Non-Discrimination on the Basis of Disability and Guidelines for American Disabilities Act Accommodations Policy ("HR-04") requires that employees requesting an accommodation complete a Reasonable Accommodation Employee Request Packet ("RA Packet") and submit it to the Human Resources Reasonable Accommodation Coordinator. (Thompson Dec. ¶¶ 4-6, ECF No. 49-5, PAGEID # 2195-96.)

The first request about which Mr. Hill complains was for recuperative time to accommodate his narcolepsy in 2017. (*See* Opp., ECF No. 55-1, PAGEID # 2389.) This rest time would have allowed him to take quiet time during his lunches and breaks, but his request was denied. (Ex. U, ECF No. 55-22, PAGEID # 2523; *see also* Hill Dep. 140:10-18, ECF No. 47, PAGEID # 928.)

Second, Mr. Hill received an accommodation of a flexible start time in 2015 to accommodate his narcolepsy—he was allowed to arrive up to 15 minutes past his scheduled start time. (*See* Hill Dep. 174:11-18, Ex. D13, ECF No. 47, PAGEID # 962, 1209.) Then, to accommodate his recent move further away from work, he wanted to adjust his start time. (Hill Dep. 134:24-135:1-10; ECF No. 47, PAGEID # 922-923.) In October 2018, he contacted HR Bureau Chief Anne Thompson and ADA Coordinator Maisha Jones requesting a modification to his flex time; they told him to complete a RA Packet, but he never did. (Thompson Dec. ¶¶ 6-9, ECF No. 49-5, PAGEID # 2196.)

The third denied request relates to the fact that Mr. Hill tests his blood sugar at least three times a day to monitor and treat his diabetes. (Hill Dep. 134:1-15,

ECF No. 47, PAGEID # 922.) MHAS permitted him to test in the employee bathroom, but he believed that to be unsanitary, so he first requested a "sanitary" testing area in December 2019. (Opp., ECF No. 55-1, PAGEID # 2409.) The request was denied a month later. (Hill Dep. Ex. D16; ECF No. 47, PAGEID # 1270.) Mr. Hill requested reconsideration of the testing area location accommodation in March 2020, but that request was denied in April 2020. (Ex. V, ECF No. 55-23, PAGEID # 2528-29.)

Mr. Hill never submitted a RA packet for any of these three requests.

### C.     Disciplinary Actions against Mr. Hill

Mr. Hill had several disciplinary and performance issues during his tenure at MHAS, resulting in multiple suspensions and placement on two performance improvement plans ("PIP"). (*See* Spolarich Dec. ¶ 10, Ex. 9, ECF No. 49-4, PAGEID # 2075.) He had three suspensions with pay on his employment record when he was terminated.

A little over a year after he started at MHAS, in July 2015, Mr. Hill was suspended for one day because he lost his keys to the central pharmacy doors and the narcotics cabinet on two separate occasions, requiring MHAS to rekey the pharmacy doors twice. (Hill Dep. 59:2-7, Ex. D8, ECF No. 47-1, PAGEID # 847, 1028.) Mr. Hill grieved his suspension through SEIU, but his grievance was denied. (*Id.* at 60:17-61:11, PAGEID # 848-849.)

His second suspension was for three days when he did not show up to work in 2016 and failed to report his absence to his supervisor. (*Id.*, 59: 18-22, Ex. D9, PAGEID # 1029.) And, in 2017, his third suspension was for five days for failure to

perform his work duties after being placed on a PIP. (*Id.*, 61:12-16, PAGEID # 849-50.)

Mr. Hill was placed on the PIP that led to his third suspension when he failed to meet the productivity standard for final checks. (Spolarich Dec. ¶ 7, Ex. 3 and 9, ECF No. 49-4, PAGEID # 2002, 2011-16; 2078.) Specifically, he completed less than half the other pharmacists' daily averages in final checks. (*Id.*, Ex. 4, PAGEID # 2011-12.) He also did not meet expectations for medication errors; at the time, he committed over half the reported medication errors in final check. (*Id.*) MHAS gave him 60 days to improve his medication error rate. (*Id.* Ex. 4, PAGEID # 2014.) When Mr. Hill's productivity and error rates did not improve after three months, his 5-Day suspension went into effect. (*Id.*, Ex. 8, PAGEID # 2024.)

Even though all pharmacists had the same productivity standard, Mr. Hill contended that the productivity rates were discriminatory, so he filed a union grievance against his 5-Day suspension. That grievance resulted in a 2018 settlement agreement, which gave him three additional months to meet the productivity standard and reduce his medication error rate—if he met the requirements, the 5-Day suspension would be removed from his record. (*Id.* Ex. 3, PAGEID # 2010.) But even after the additional three months, he failed to meet the requirements.

In 2018, Mr. Hill was placed on a second PIP for failure to meet the required final check production rate and for his medication error rate. (*Id.*, Ex. 5, PAGEID # 2017-21.) Again, he was given a plan to improve his productivity and reduce his

medication errors. (*Id.*) He again complained in response to his 2018 PIP that he felt the productivity rates were discriminatory and unfair. (Opp., ECF No. 55-1, PAGEID # 2406.)

When he was on the PIPs, in effort to make it easier for him to increase his productivity, Mr. Hill was not required to perform many of the basic pharmacist duties. (Spolarich Dec., Ex. 3, ECF No. 49-4, PAGEID # 2015.) For example, while on the PIP, Mr. Hill was not required to float between the validating and final check roles. (Hill Dep. 81:1-4,17-82:2, ECF No. 47, PAGEID # 869-70.) Nevertheless, Mr. Hill argues that his production rates were low because he would be interrupted by other tasks, which he calls "rate reducers," such as completing compounded prescriptions, controlled substance medications with special inventory tracking and notation requirements, and prescriptions requiring additional documentation for half-way houses, county jails, and youth facilities. (Opp., ECF No. 55-1, 2391.)

When Greg Cudzil became Mr. Hill's supervisor in June 2019, Mr. Hill was still on the second PIP. (Cudzil Dec. ¶ 20, ECF No. 49-3, PAGEID # 1588; Cudzil Dep. 30:4-11, ECF No. 48, PAGEID # 1321.) Mr. Cudzil met with Mr. Hill two times between August 2019 and September 2019 in an effort improve Mr. Hill's performance. (Cudzil Dec. ¶ 20, ECF No. 49-3, PAGEID # 1588.)

### D. MHAS Increases the Productivity Standard

In December 2019, Mr. Cudzil and Richard Ives (another CPI supervisor) informed the pharmacists of a new productivity standard. After collecting data for seven weeks, Mr. Cudzil and Mr. Ives had determined that pharmacists would be required to average 175 final checks per hour for at least 50% of the time. (Cudzil

Dec. ¶ 21, ECF No. 49-3, PAGEID # 1588.) Mr. Cudzil met with Mr. Hill one-on-one to inform him of the new requirement. (*Id.* ¶ 24, PAGEID # 1589.)

A month later, Mr. Cudzil met with all the pharmacists he supervised to review their performances. (*Id.* ¶ 20.) With Mr. Hill, Mr. Cudzil discussed that his production had ranged from 121 to 156 final checks per hour for the previous six weeks and that Mr. Hill had made three medication errors. (*Id.* ¶ 26.) Mr. Cudzil decided that he would monitor Mr. Hill every week for improvement. (*Id.*)

Between February 2020 and May 2020, Mr. Cudzil and Mr. Hill met at least 14 times. (*Id.*, Ex. 2, PAGEID # 1593.) Mr. Hill met the required rate of 175 final checks per hour only one time in 25 weeks; during the same period, he made 13 medication errors. (*Id.* ¶ 28, 29 PAGEID # 1590.) As a result, Mr. Hill was referred to HR. (*Id.* ¶ 30.)

### E. Mr. Hill's Termination

Labor Relations Administrator Laurie Spolarich and Labor Relations Officer Mindy Owens were tasked with investigating Mr. Hill's performance. (Spolarich Dec. ¶ 3, ECF No. 49-4, PAGEID # 2001.) When they met with Mr. Hill, he admitted that was aware of the productivity standard for final check and that he was unable to meet the requirement. (Hill Dep., Ex. 11, ECF No. 47, PAGEID #1102-03.) Thus, MHAS started termination proceedings; Mr. Hill's employment was terminated in July 2020. (*Id.* ¶ 10, Ex. 1, PAGEID # 2003; 2005.)

Mr. Hill filed a union grievance challenging his removal. (Hill Dep. 38:5-21, ECF No. 47, PAGEID # 826; *see* Ex. H, ECF No. 55-9, PAGEID # 2436-53.) An arbitrator found there was no evidence of race or disability discrimination and also

found that Mr. Hill had received accommodations by being allowed to sit and stand while performing his duties. (*Id.*, PAGEID 2447, 2451.) Nevertheless, the arbitrator ordered Mr. Hill reinstated because Mr. Hill had not been notified that he would be terminated if he was unable to meet the productivity standard. (*Id.*)

### F. Mr. Hill's Reinstatement and Resignation

MHAS reinstated Mr. Hill, and he reported back to work in August 2021. (Hill Dep. 42:15-24, ECF No. 47, PAGEID # 830.) As required by the arbitration decision, he attended orientation and additional training the week of his return. (*Id.* 44:1-23, PAGEID # 832.) MHAS then provided all of its pharmacists with an Acknowledgment Letter detailing the final check productivity standard and MHAS's expectations as to medication error rates; all pharmacists were to sign and return the Letter to their supervisors. (*See id.* 51:9-52:20, PAGEID # 839-40.) Mr. Hill signed "in protest." (Ives Dec., Ex. 1, ECF No. 49-2, PAGEID # 1573.)

Mr. Hill resigned in October 2021. (Hill Dep. 110:23-111:15, ECF No.47, PAGEID # 898-99.)

## II. PROCEDURAL BACKGROUND

Mr. Hill filed a charge of discrimination with the Equal Employment Opportunity Commission and received a Right to Sue Letter on May 13, 2021. (Ex. A, ECF No. 18, PAGEID # 417.) He filed another charge of discrimination on December 16, 2021, and received a Right to Sue Letter on May 10, 2022. (Ex. 3, ECF No. 55-29, PAGEID # 2539.) His *pro se* Complaint was filed in this Court in May 2021, alleging race discrimination. Subsequently, Mr. Hill amended his complaint. (Am. Compl., ECF No. 18.)

Count I alleges race discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. (Am. Compl. ¶¶ 22-27, ECF No. 18, PAGEID # 409.) Count II is for retaliation under Title VII. (*Id*. ¶¶ 28-36, PAGEID # 410.) Mr. Hill alleges disability discrimination under the Rehabilitation Act, 29 U.S.C. § 791 *et seq*. in Counts III and IV. (*Id*. ¶¶ 37-51, PAGEID # 411-12.) Count V is a retaliation claim under the Rehabilitation Act. (*Id*. ¶¶ 52-58, PAGEID # 412-13.) Finally, in Count VI, Mr. Hill seeks to enforce the June 2021 arbitration award. (*Id*. ¶¶ 59–64, PAGEID # 413-14.)

## III.  STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as

to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## IV.   ANALYSIS

### A.   Race Discrimination Claim–Count I

Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e–2(a)(1). To survive summary judgment, Mr. Hill must establish a *prima facie* case of discrimination by presenting either direct or circumstantial evidence that would support an inference of discriminatory intent. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir.2000).

#### 1.   Direct Evidence

"[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003). For direct evidence, there is no need for the factfinder to draw any inferences to conclude that the challenged employment action was motivated, at least in part, by prejudice against members of a protected group. *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir.2000).

"Any discriminatory statements must come from decisionmakers to constitute evidence of discrimination." *Flones v. Beaumont Health Sys.*, 567 Fed.Appx. 399, 404 (6th Cir.2014) (citations omitted). "Statements by non-decision makers, or statements by decisionmakers unrelated to the decisional process itself, do not satisfy the plaintiff's burden to demonstrate animus." *Id.* If the plaintiff presents direct evidence of discriminatory intent in connection with a challenged employment action, "the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Nguyen,* 229 F.3d at 563.

Mr. Hill argues that alleged comments made by MHAS's CEO Sue Griffith and his then-supervisor, Brandon Haas, constitute direct evidence of discrimination. First, he claims that Ms. Griffith stated during his 2018 grievance settlement meeting, "It's that 'wily' Alfred Hill. He always gets away…but He [sic] won't get away today. We're going to get him!" (Opp., ECF No. 55-1, PAGEID # 2400-2401.) Second, he asserts Mr. Haas commented to Mr. Cudzil and another staff pharmacist, "Some people don't deserve their jobs and others deserve to have those peoples' jobs." (*Id.* at PAGEID # 2401.)

Neither of these comments compels the conclusion that MHAS was motivated by racial animus. Any belief Ms. Griffith held about Mr. Hill's race and whether she sought to have him removed because of this belief must be inferred from her comment. Similarly, Mr. Haas's comment requires inferential leaps to racial bias. Also, these isolated comments are not tied to any decision-making process to

13

discipline or terminate Mr. Hill. Thus, there is no direct evidence of discriminatory intent.

### 2.    Circumstantial Evidence

Because Mr. Hill lacks direct evidence of discriminatory intent, his race discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir.2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), as modified by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)). Under this approach, Mr. Hill must establish a *prima facie* case of race discrimination by showing that 1) he is a member of a protected class; 2) he was qualified for the job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class. *See Logan*, 259 F.3d at 567; *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992). Establishing a *prima facie* case creates a rebuttable presumption that MHAS engaged in unlawful conduct. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993).

MHAS argues that Mr. Hill cannot establish the fourth element of his *prima facie* case that he was treated less favorably than a similarly situated comparator.[2] (Mot. ECF No. 49, PAGEID # 1540-41.)

---

[2] MHAS also argues that Mr. Hill failed to exhaust his administrative remedies on his allegation of constructive discharge, and that he cannot establish the elements of constructive discharge. Because the Court finds, *infra*, that Mr. Hill

14

To demonstrate treatment less favorable than that given to a similarly situated individual, a plaintiff must establish that "a comparable non-protected person was treated better" than him "for the same or similar conduct." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir.1992). He "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated'"; "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all relevant aspects.'" *Ercegovich*, 154 F.3d at 352 (citing *Pierce v. Commonwealth Life Ins.* Co., 40 F.3d 796, 802 (6th Cir.1994)). Courts are to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and the comparator employee." *Id.* Mr. Hill argues that the pharmacy technicians and the other pharmacists at MHAS are his comparators. (Opp., ECF No. 55-1, PAGEID # 2401; Hill Dep. 81:1-8, 87:11-24; 90:14-17, ECF No. 47, PAGEID # 869, 875, 878.)

***Pharmacist Technicians***. Mr. Hill claims that the pharmacy technicians were allowed to correct their medication errors and were not disciplined for those errors although he was. (Hill Dep. 54:2-16, ECF No. 47, PAGEID # 842.) But technicians were not similarly situated to him. They have entirely different job duties and responsibilities, report to different supervisors in many cases, and are governed by different policies and procedures. (*See* Ives Dec. ECF No. 49-2, Ex. 3, 4,

---

cannot establish the fourth element of his *prima facie* case, it need not address MHAS's constructive discharge arguments.

PAGEID # 1581-1582.) Pharmacy technicians are trained and supervised by pharmacists. (*See id.*, Ex. 1, PAGEID # 1573) ("It is the expectation that all pharmacists working for Central Pharmacy Inpatient take an active role in training and developing the skills of pharmacy technicians working here.") Because of these differences, pharmacy technicians are not appropriate comparators.

***Other Pharmacists***. Mr. Hill argues that he was treated different than similarly situated pharmacists in two ways. First, he claims other pharmacists were not disciplined for engaging in similar conduct for which he was disciplined. Second, he claims that he was singled out to complete "harder" manual prescription orders instead of computerized orders and was assigned "rate reducers" that affected his productivity rates. (Opp., ECF No. 55-1, PAGEID # 2392.)

Starting with the alleged disparities in discipline, Mr. Hill identifies three situations when other pharmacists were treated differently: 1) when he lost his pharmacy keys and was placed on a 1-day suspension, a white pharmacist admitted to losing Mr. Hill's keys but was not punished; 2) when Kyle Cockerill, a white pharmacist, was not disciplined for "voided night stock prescription errors"; and 3) when a Pharmacy Services supervisor made two errors on inventory book entries and was not disciplined. (*Id.*, PAGEID # 2397, 2403.) However, Mr. Hill provides no evidence of how these situations and employees are similar to him. First, Mr. Hill was disciplined after losing *his* own keys twice, and the statute of limitations has run on any challenges to that discipline. Second, Mr. Hill has not shown how voided night stock errors and inventory book entries are similar to the kind of errors for

16

which he was disciplined (medication errors and failing to meet the productivity requirements). Finally, he was not terminated for medication errors; the undisputed evidence reveals that his termination was based on his failure to meet the 175 per hour final check productivity standard. (*See* Hill Dep., Ex. D11, ECF No. 47-1, PAGEID # 1082.)

Turning to Mr. Hill's other basis for comparison, there is no evidence that he was singled out to perform "harder" manual prescriptions and "rate reducers". All pharmacists were assigned other duties and conducted final checks while having to meet the same productivity standard. (*See* Cudzil Decl., Ex. 8, ECF No. 49-2, PAGEID # 1999-2000.) Pharmacists performing final checks selected their own prescription trays that were either manual or computerized orders, and all pharmacists were required to perform final checks on both computerized system orders and the "harder" manual prescriptions. (*Id.*; *see* Spolarich Dep., Ex. 4, ECF No. 49-4, PAGEID # 2012.) Although Mr. Hill asserts that he was singled out to perform final checks, Mr. Cockerill worked exclusively on final checks. (Cudzil Dep. 53:2-20, ECF No. 48, PAGEID # 1344.) Importantly, Mr. Hill agreed to conduct more final checks as part of his 2018 grievance settlement when he failed to meet the requirements and was placed on two PIPs. Though Mr. Hill argues that the final check productivity standard is unfair, the same standard applied to all the pharmacists.

Thus, Mr. Hill has failed to establish that his proposed comparators engaged in the same conduct without such differentiating or mitigating circumstances that

would distinguish their conduct or the employer's treatment of them for it. Accordingly, Mr. Hill has failed to establish his *prima facie* case for his race discrimination claim, and MHAS is entitled to summary judgment on Count I.

### B.    Disability Discrimination Claims–Counts III and IV

The Rehabilitation Act prohibits federal agencies and programs receiving federal funding from discriminating against any qualified individual with a disability. 29 U.S.C. § 791(a).

As with Title VII claims, a plaintiff can establish a claim for disability discrimination using either by direct or circumstantial evidence.[3] *Bent-Crumbley v. Brennan*, 799 Fed. Appx. 342, 345 (6th Cir.2020). Because he does not have direct evidence, Mr. Hill must establish his *prima facie* case by a preponderance of the evidence that: 1) that he has a disability, 2) that he is otherwise qualified to perform the job requirements with or without reasonable accommodation, and 3) that an adverse action was taken *solely* by reason of his disability. *(Id.)*

MHAS asserts that Mr. Hill cannot establish the third element of his *prima facie* case because he cannot show that the alleged adverse actions (progressive discipline, termination, and constructive discharge) were motivated solely by reason of his disability. In response, Mr. Hill claims that there are genuine issues of material fact because 1) the arbitrator found that "his disability could have played a role" in his termination, 2) he was singled out for final check duties while

---

[3] Mr. Hill argues Ms. Griffith's statement that she wanted him fired is also direct evidence of discriminatory intent based on his disability, but the alleged comment requires inferences of disability animus, and therefore, fails to demonstrate disability discrimination.

technicians and other pharmacists were not, and 3) his supervisors and other decision-makers were aware of his disability. (Opp., ECF No. 55-1, PAGEID # 2410.) None of Mr. Hill's arguments are successful.

First, even assuming the arbitrator's findings would be admissible, the arbitrator did not find that his disability played a role in Mr. Hill's termination. (Ex. H, ECF No.55-9, PAGEID # 2447.) Second, as discussed above, Mr. Hill provides no evidence that he was treated differently than any other pharmacist with regard to his job duties. And third, while his supervisors knew of his disability, Mr. Hill fails to tie that knowledge to any discipline, his termination, or his ultimate decision to quit his job at MHAS.

The undisputed evidence is that Mr. Hill consistently failed to meet the final check productivity standard; he admitted as much when he was interviewed by the Labor Relations staff in 2020. Hence, Mr. Hill has not established a *prima facie* case under the Rehabilitation Act, and MHAS is entitled to summary judgment on Counts III and IV to the extent he alleges disability discrimination.

### C.    Reasonable Accommodation Claim–Count III

MHAS seeks summary judgment on Mr. Hill's failure to accommodate claim because any alleged injury occurred more than two years before the filing of his Amended Complaint and because it never denied him reasonable accommodation. (Mot., ECF No. 49, PAGEID #1551-52.)

### 1. Parts of Mr. Hill's failure to accommodate claim are time-barred.

Rehabilitation Act claims are governed by Ohio's two-year statute of limitations for personal injury claims. *Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 292 (6th Cir.2019). The statute of limitations begins to run "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir.1984). A denial of a request for accommodation is a discrete act that starts the clock on the statute of limitations. *See Horton v. Potter,* 369 F.3d 906, 910 (6th Cir.2004); *see also Tobin v. Liberty Mut. Ins. Co.,* 553 F.3d 121, 129 (1st Cir.2009) ("If the request [for an accommodation] is refused, the refusal is a discrete discriminatory act triggering the statutory limitations period.") (internal quotations and citations omitted). The limitation period for bringing such a charge begins to run from the date the refusal to accommodate occurred—not the date of the request. *See Horton*, 369 F.3d at 910.

Mr. Hill's 2018 and 2020 requests for accommodations were refused more than two years before the filing of his Amended Complaint. (Hill Dep. 173:17-174:22, ECF No. 47, PAGEID # 961-62; Ex. V, ECF No. 55-23, PAGEID # 2528.) These allegations were not included in his original Complaint, and they are, therefore, barred by the statute of limitations. *Lock v. FedEx Corp. Services, Inc.*, No. 15-CV-02647-STA-TMP, 2015 WL 7018398, at *3 (W.D. Tenn. Nov. 12, 2015) (finding that the disability discrimination claim was never mentioned in the original complaint; therefore, that claim does not "relate back" to amended complaint). As such, these parts of his claim are time barred.

20

##### 2. Mr. Hill has failed to establish a *prima facie* case for failure to accommodate on the remaining parts of his claim.

Mr. Hill attempts to save his failure to accommodate claim by arguing that, although he first requested recuperative time in 2017, he asked for that accommodation again in October 2021. Mr. Hill also claims that he asked for a flex time modification accommodation in October 2021.

"An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." *Edwards v. United States EPA,* 456 F. Supp. 2d 72, 102 (D.D.C.2006) (quotations omitted); *see Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042, 1046 n. 4 (6th Cir.1998) (explaining that reasonable accommodation is not at issue if the plaintiff has never requested accommodations). An employer is "not obligated to provide accommodation until plaintiff ha[s] provided a proper diagnosis ... and requested specific accommodation." *Kaltenberger v. Ohio Coll. of Podiatric Med.,* 162 F.3d 432, 437 (6th Cir.1998). When an employer establishes a fixed set of procedures to request accommodations, the employee's failure to file a proper request dooms his claim for failure to accommodate. *Erbel v. Johanns*, No. 304-CV-555, 2007 WL 1387331, at *7 (E.D. Tenn. May 8, 2007) (citation omitted).

MHAS had an established procedure—submit an RA packet—but there is no evidence that Mr. Hill complied with this procedure for either of his 2021 requests. Accordingly, MHAS is entitled to summary judgment on Count III to the extent Mr. Hill asserts a failure to accommodate based on disability.

### D.  Retaliation Claims–Counts II and V

Both Title VII and the Rehabilitation Act prohibit employers from retaliating against an employee because that employee has engaged in protected conduct. *See* 42 U.S.C. § 2000e–3(a); *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 696-97 (6th Cir. 2013) (citations omitted). An employee who opposes any unlawful discriminatory conduct has engaged in "protected activity." *See Stanley v. ExpressJet Airlines, Inc.*, 808 F. App'x 351, 357 (6th Cir. 2020). The filing of formal discrimination charges with the EEOC is protected, as are complaints to management and less formal protests of discriminatory employment practices. *See Trujillo v. Henniges Auto. Sealing Sys. NA., Inc.,* 495 Fed. Appx. 651, 655 (6th Cir.2012), *as amended* (Oct. 17, 2012) (citation omitted).

A retaliation claim can be established using either direct or circumstantial evidence. *Imwalle v. Reliance Med. Products, Inc.,* 515 F.3d 531, 538 (6th Cir.2008) (analyzing Title VII retaliation claim); *Shelby Cnty.* 711 F.3d at 697 (examining retaliation claim under the Rehabilitation Act). Because Mr. Hill does not have direct evidence, he must establish his *prima facie* case using the familiar *McDonnell Douglas* burden-shifting test: (1) he engaged in protected activity; (2) MHAS knew of his protected activity; (3) MHAS then took "materially adverse" actions against him; and (4) Mr. Hill's protected conduct was the but-for cause of the adverse action. *Burns v. City of Saginaw*, 601 F. App'x 353, 357 (6th Cir. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).

Mr. Hill asserts that his 2020 termination was retaliatory, as was the Acknowledgement Letter he was required to sign upon his reinstatement. He argues that MHAS took these adverse actions against him because of (1) his remarks in his 2017 and 2018 PIPs concerning race and disability discrimination, (2) his accommodations requests, (3) his July 2020 and September 2021 union grievances, (4) his May 2021 and December 2021 EEOC charges, (5) this May 2021 discrimination suit, and (6) his June 2021 arbitration.

Retaliation claims "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar,* 570 U.S. at 360. To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that his protected activity was the likely reason for the adverse action. *Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir.2007). While temporal proximity alone cannot establish a causal connection, a lack of temporal proximity alone can be fatal to an attempt to establish a causal connection. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 676 (6th Cir.2013) (citing *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007).

Here, Mr. Hill cannot demonstrate that his protected activity is the "but for cause" of any materially adverse action. His PIP complaints occurred at least two years before his termination, as were most of his accommodation requests. Although he did make another accommodation request in 2020, roughly three months before his termination, there is no other indicia of a causal connection. *See Randolph v.*

23

*Ohio Dep't of Youth Servs.,* 453 F.3d 724, 737 (6th Cir.2006) ("although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection"). Moreover, there can be no causal connection between his 2020 and 2021 grievances, his EEOC complaints, and/or the arbitration, on one hand, and his termination on the other because those activities took place after MHAS fired him. Likewise, Mr. Hill's protected activity is too far removed from when the Acknowledgment Letter was issued, and there is no evidence to find that the letter was issued for retaliatory reasons.

Accordingly, MHAS is entitled to summary judgment on Counts II and V.

### E.     Enforcement of Arbitration Award–Count VI

Having granted summary judgment on all of Mr. Hill's federal claims, the Court declines to exercise supplemental jurisdiction over his state-law claim. Federal courts are "courts of limited jurisdiction" that "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Once a court has original jurisdiction over some claims in the action, it can exercise supplemental jurisdiction over additional claims part of the same case or controversy. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *Harper v. Auto All. Int'l, Inc.*, 392 F.3d 195, 209 (6th Cir.2004) (holding that claims are part of the same case or controversy if they derive from a "common nucleus of operative facts"). But supplemental jurisdiction is a matter of judicial

discretion and "need not be exercised in every case in which it is found to exist." *United Mine Workers of Am.*, 383 U.S. at 726.

Exercising supplemental jurisdiction over Mr. Hill's state-law claim after dismissing the federal claims would not serve judicial economy, convenience, or comity, and therefore, the Court declines to do so. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988). Accordingly, Mr. Hill's claim to enforce the arbitration award is dismissed without prejudice to refiling in state court.

## V.     CONCLUSION

For the reasons set forth above, Mr. Hill's Motion to Amend *Instanter* is **GRANTED**. MHAS's Motion for Summary Judgment (ECF No. 49) is **GRANTED** as to Counts I through V. Mr. Hill's claim for enforcement of the arbitration agreement is dismissed **WITHOUT PREJUDICE** to re-filing in state court. The Clerk shall enter judgment accordingly and **TERMINATE** this case from the docket records of the United States District Court for the Southern District of Ohio.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**